**NORTH SLOPE BOROUGH et al., Plaintiffs,**

v.

**Cecil D. ANDRUS and Richard A. Frank, Defendants,**

**Atlantic Richfield Company et al., Intervenor-Defendants.**

**NATIONAL WILDLIFE FEDERATION et al., Plaintiffs,**

v.

**Cecil D. ANDRUS and Richard A. Frank, Defendants,**

**Atlantic Richfield Company et al., Intervenor-Defendants.**

**VILLAGE OF KAKOTVIK et al., Plaintiffs,**

v.

**Cecil D. ANDRUS and Richard A. Frank, Defendants,**

**Atlantic Richfield Company et al., Intervenor-Defendants.**

**Civ. A. Nos. 79–3193, 79–3199 and 79–3216.**

United States District Court, District of Columbia.

Jan. 22, 1980.

See also, 486 F.Supp. 326.

Bruce Terris, Edward M. Comer, Washington, D. C., for North Slope Borough et al.

Patrick A. Parenteau, Thomas G. Tomasello, Washington, D. C., for National Wildlife Federation et al.

Clifton E. Curtis, James N. Barnes, Leonard C. Meeker, Center for Law & Social Policy, Washington, D. C., for Village of Kaktovik.

Margaret Strand, Marine Resources Div., Dept. of Justice, E. Edward Bruce, John T. Smith, II, Covington & Burling, Washington, D. C., for defendants.

Avrum M. Gross, Atty. Gen., Robert M. Maynard, Asst. Atty. Gen., Robert H. Loeffler and Alan Cope Johnston, Morrison & Foerster, Washington D. C., for amicus curiae State of Alaska.

## MEMORANDUM OPINION AND ORDER

AUBREY E. ROBINSON, Jr., District Judge.

Before the Court are Cross Motions for Summary Judgment in separate actions brought by the North Slope Borough, *et al.*, the National Wildlife Federation, *et al.*, and the Village of Kaktovik, *et al.*, against Cecil B. Andrus, *et al.* Plaintiffs are requesting a permanent injunction due to alleged violations of a Federal Trust Responsibility to native Americans, the Endangered Species Act (ESA), 16 U.S.C. § 1531 *et seq.*, the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq.*, the Outer Continental Shelf Lands Act (OCSLA), 43 U.S.C. § 1331 *et seq.*, the Marine Mammal Protection Act (MMPA), 16 U.S.C. § 1361 *et seq.*, The Migratory Bird Treaty Act (MBTA), 16 U.S.C. § 703 *et seq.*, and the Agreement on the Conservation of Polar Bears. The actions giving rise to Plaintiffs' claims stem from an offshore oil and gas lease sale in the Beaufort Sea, north of Alaska. Each of the above statutes provides for jurisdiction in this court, as does 28 U.S.C. § 1331.

The undisputed material facts of the case may be summarized as follows:

The Beaufort Sea and nearby shore areas are habitat for many wildlife species, including the Bowhead and Gray whales, polar bears, seals, fish, caribou and enormous numbers of birds. Little is known about the breeding habits, mating activities, critical habitat and response behavior to human activities of the whales. Both species of whales are listed as endangered under the Endangered Species Act. The Bowhead is particularly endangered, and has been completely protected from commercial whaling by the International Convention for the Regulation of Whaling since 1946.

The best available estimate of the present size of the Bowhead population is 2,264, with a possible range of between 1,783 and 2,865 animals. This figure is a small fraction of its initial population size.

· The Bowhead whale inhabits the Bering Sea in the winter. During the spring, they migrate north and east through leads (open water) in the ice past the Bering Strait and through the Beaufort Sea to the Canadian Arctic. In autumn, the whales migrate westward, close to the shore, along the north coast of Alaska and then southward to the Bering Sea. The Bowheads travel through the lease area beyond the barrier islands during their fall migration. The Gray whales, while not as affected by the proposed lease sale, are also known to frequent the lease area.

The Beaufort Sea lease sale was first proposed by the Bureau of Land Management of the Department of Interior (BLM) in November 1974. The National Marine Fisheries Service (NMFS) first formally identified problems associated with the protection of endangered whales and other marine animals in the Beaufort Sea in August 1976. Yet BLM did not begin to consider the impacts of the lease sale on endangered species until February 1978.

In March 1978, BLM requested formal consultation with NMFS under Section 7(a) of the ESA on the effects of the proposed lease sale in the nearshore Beaufort Sea on the endangered Bowheads and Gray whales. Also in March, the Secretary of the Interior concluded a Memorandum of Understanding with the State of Alaska for a joint lease sale for disputed submerged lands as authorized under Section 7 of the Outer Continental Shelf Lands Act, and a call for nominations was issued jointly by the Department of the Interior and the State of Alaska.

In response to the call for nominations, recommendations and comments were received from interested members of the public, industry, government, and environmental groups. Thirteen companies nominated all 236 leasing tracts, while comments from some governmental agencies, regional native corporations, and environmental groups recommended that certain areas be deleted from leasing consideration. BLM, in conjunction with the State of Alaska, reviewed the industry nominations and the public comments received in response to the call for nominations. It consulted with the Fish and Wildlife Service, the National Park Service, the Geological Survey, the National Oceanic and Atmospheric Administration, agencies of the State of Alaska, and the North Slope Borough. Following review of nominations and comments and consultation with other agencies, BLM and Alaska selected 186 tracts of submerged lands in the Beaufort Sea for detailed environmental study for possible oil and gas leasing.

The Bureau of Land Management compiled and published a final Environmental Impact Statement (EIS) which attempts to analyze the environmental impact of the proposed joint lease sale and resulting activities. The EIS contains sections describing (1) the proposed action, (2) the environment of the area affected by the sale and resulting activities, including the animals, ecosystems and socio-economic systems affected by the proposed action, (3) mitigating measures to reduce environmental impacts, (4) unavoidable adverse effects, (5) irreversible and irretrievable commitments of resources involved in the proposed action, and (6) alternatives to the proposed action.

In the section entitled Unavoidable Adverse Effects, the EIS states, in pertinent part:

A serious, adverse environmental impact might result if petroleum hydrocarbons, in the form of an oil slick or diluted formation waters, enter a river delta just before winter freeze-up. The toxicity of the petroleum hydrocarbons and simultaneous depletion of oxygen in the water · would eventually kill most of the fish overwintering in the delta. Should oil or other pollutants reach these areas the unavoidable impact would be a reduction of fish numbers. Population recovery may take one to five years.

Oil slicks may enter ice leads or drift into shallow lagoons. Some consequences will probably be the oiling and subsequent death of seals or large flocks of birds that swim or dive through the slick. Numbers of both these groups of animals (ringed seals, oldsquaw, and other ducks) would

be unavoidably reduced. Polar bear populations would also be reduced.

Principal adverse impacts on birds in the proposed lease area will be in the form of acute and chronic oil spills. An acute oil pollution event has the potential of directly causing losses of large numbers of birds, or reducing the availability of food and/or suitability of habitat. The most vulnerable species include those that gather in flocks, swim, or dive. A spill hitting any large concentration of birds would result in high mortality. Chronic oil pollution will occur, increasing environmental stresses. The magnitude of these impacts would vary by species, time of the year, amount and type of oil spilled, and location of the spill.

Onshore development will result in the loss of wildlife habitat. Significant shifts in species composition and distribution can occur through habitat alteration. In addition to displacement by direct human intervention, more tolerant avian species could become dominant at the expense of these that are less adaptable.

Unavoidable effects can result in a general reduction of wildlife as a result of increased development and disturbance. Based on the worst case assumptions identified in section III, the Bowhead and Gray whales could be severely affected. However, the lack of scientific data precludes quantitative or qualitative assessment of positive or negative impacts of oil and gas development on the Bowhead and Gray whales. Consequently, it is impossible to identify unavoidable effects of oil and gas development on the endangered species of Bowhead and Gray whales.

All of the animal species mentioned above are used by the Natives of the area for subsistence purposes. Reduction of species populations will affect the amount available to the Natives. Should this happen an unavoidable effect would be a further erosion of the subsistence lifestyle.

In the Section entitled Irreversible and Irretrievable Commitment of Resources In-

volved in the Proposed Action, the EIS states in pertinent part:

General industry activity will displace animals traditionally hunted for subsistence by local inhabitants. Marine mammals will probably be displaced by increased ship activity during summer. Activity on land and airborne noises will probably displace birds and other wildlife.

These displacements may be irreversible because nuisance species (gulls, ravens, and sick animals, such as rabid arctic foxes) usually move in and occupy vacated niches near settlements. Even if the impacts on biological resources used by local inhabitants are eventually reversible, the social and cultural effects of the impacts must also be considered.

As discussed in Section III.D.2–.5, the sociological impacts from the proposed sale are an increase of the present changes toward western values, a reduction of subsistence food gathering and related lifestyle values, and a probable decline in the overall health of the Inupiat. Whether or not these impacts are irreversible and/or irretrievable is debatable. A decline in health resulting in early death is definitely irretrievable. Further declines in Inupiat lifestyle values, culture, and culture related activities may be irreversible. They are definitely irreversible and irretrievable if continued past the collective memory of those activities.

On August 25, 1978, NMFS made a threshold determination that insufficient information existed to determine whether the lease sale would jeopardize the continued existence of either of these species. It identified important gaps in existing scientific information on these whales, including "the timing of movements and offshore distribution of [these whales] through the proposed lease areas and adjacent waters," the "undisturbed behavior" of the whales, the impact of "OCS drilling sites . . . ship traffic and accidental oil spills on baleen whales," and "the reasons why [these whales] frequent the area." NMFS recommended that BLM conduct additional bio-

logical surveys and studies on endangered whales.

On March 22, 1979, the Marine Mammal Commission wrote a letter to BLM in which it analyzed the research program proposed by BLM's research contractor, the Naval Arctic Research Laboratory. In that letter, the Commission stated that the ongoing research proposal was not responsive to the work statement prepared by BLM's Alaska Office, was not responsive to NMFS' recommendations for a research program, would not provide the information necessary to judge the impact of oil and gas development on endangered whales, and was duplicative of work being conducted or planned by NMFS. In response to these problems, BLM and NMFS signed a cooperative research agreement on Bowhead whale research in the Beaufort Sea on June 26, 1979. Thus, research programs on the breeding grounds, migration routes, feeding behavior and food chain of Bowhead whales are just beginning and, according to the EIS, will not be completed for up to five years.

On October 15, 1979, NMFS advised BLM that it should adopt four alternative measures to the action proposed in the EIS, to avoid possible adverse impacts on the Bowhead and Gray whales. Three of the measures were adopted in their entirety. The fourth measure was partially adopted. NMFS recommended that BLM prohibit all but emergency drilling between March 31 and November 1 until the Department of Interior could insure that exploration and production was not likely to jeopardize the continued existence of the whales. This measure was recommended because it is highly unlikely that any whales frequent the lease area before the beginning of June.

The Secretary declined to issue such a broad seasonal restriction, however. Rather, he incorporated the seasonal restriction for a two year period. The only reason that can be gleened from the evidence for limiting the seasonal restriction to two years is that an indefinite seasonal restriction would, according to the Defendants' calculations, render the leases economically worthless.

On November 2, 1979, the Secretary of the Interior decided to proceed with the sale based on consideration of the EIS and on a final Secretarial Issue Document (SID) analyzing the pros and cons of the sale and discussing, among other things, consultations with NMFS that had occurred subsequent to the EIS.

On November 7, 1979, Interior published a final notice of sale indicating which tracts in the Beaufort Sea would be leased at a lease sale set for December 11, 1979. The sale was held on that date and bids totalling $1.086 billion were received. Bidders were informed that "a two year whale research program has been developed by BLM in order to acquire the information identified by NMFS as necessary for an assessment of the affects of the proposed sale on these two endangered whales [Bowhead and Gray]." "Lessees will be advised as to what, if any, restrictions on operations will be necessary to be consistent with the Endangered Species Act. This determination will be made by the Secretary of Interior in consultation with NMFS." Bidders were informed that it might be necessary to continue the research program beyond two years.

The effects of the lease sale and subsequent activities on the indigenous population are enormous. As the Environmental Impact Statement indicates, the Inupiat Eskimos (who are native peoples of the North Slope), depend upon hunting and fishing of whale, seals, fish, caribou, and other wildlife for their subsistence. "These activities occur over vast tracts of land and sea. They involve social and cultural tradition, health and nutrition, and the simple economics of providing for food, clothing, and shelter." "[A]ny substantial reduction in subsistence gathering would drastically hurt the Inupiat healthwise and socio-culturally." "The significance of subsistence is not in food gathering alone, but with the intertwining of food gathering and the socio-cultural identification of a traditional and unique lifestyle. The Inupiat lifestyle gives the Natives of the region a sense of pride, identity, distinction and unity."

Whaling activities are "[t]he essence of the contemporary Barrow Inupiat culture" and are also vitally important to the Nuiqsut and Kaktovik communities. Whaling "serves to integrate the community socially and culturally" and "has great symbolic value." It is "a total community affair."

"If whaling were to permanently cease among the Inupiat of Barrow because of outside intervention, the results would be catastrophic. The same is true of the cultural complexes of Nuiqsut and Kaktovik. Socio-culturally the damage would be irreparable."

The scientific panel on the cultural aspects of Alaskan aboriginal whaling, which was sponsored by the International Whaling Commission, has found that "[c]ontinued limitations on hunting of the Bowhead whale, together with severe restrictions on other subsistence activities, such as caribou hunting, threaten the survival of Eskimo culture and the organization of their society." The panel also found that reduced subsistence activities could cause increased social and cultural disruptions, which already are being manifested in "violence, drug and alcohol dependence, family breakdown, and frightenly [sic] high suicide rates."

Defendant Frank has stated that "[t]he [native] diet of the Eskimo population confers health advantages on the population necessary for its survival in a harsh climate." He also stated that no alternative food source "is a viable alternative of substantial size to the Bowhead whale" and that importation of commercial foodstuffs "would almost surely have adverse effects upon the health of the Eskimo population." "Indeed, when changes in the Eskimo diet have taken place, adverse consequences in nutritional health have been documented. Other alternative subsistence food sources, available to a limited extent, cannot substantially replace whale meat because of problems associated with availability, hunting effort, and Eskimo acceptance."

The scientific panel on the nutritional aspects of aboriginal whaling, which was sponsored by the International Whaling Commission, has found that when Eskimos have changed to a modern diet, their health and nutrition have deteriorated. The Nutrition Panel stated that "there is little doubt that preservation of traditional nutrition habits and lifestyle, and that includes in particular consumption of meat and organs from sea mammals, is highly desirable for Eskimos in order to safeguard their health."

Finally, the EIS found that "there are not sufficient employment opportunities to enable the Inupiat to subsist in a total cash economy. Thus, it is highly probable that forcing the Inupiat to greatly change their subsistence lifestyle would reduce them to economic chattels."

Opposing the environmental and sociological obstacles involved in the lease sale are its perceived advantages, *to wit*: (1) the possible recovery of significant quantities of oil and gas, and (2) the enormous profit-making potential for successful lessees. According to the EIS, "the chance of discovering commercial quantities of oil and gas is 50 percent." The estimated quantity of recoverable oil is between 500 million and 1.25 billion barrels; the most likely amount recoverable is 750 million barrels. The estimated quantity of recoverable gas ranges between 875 billion cubic feet and 3.125 trillion cubic feet; the most likely amount that can be recovered is 1.625 trillion cubic feet. According to the EIS, the likely value of Beaufort Sea oil (in 1978 dollars) ranges from $3.7 billion to $9.3 billion at the wellhead and $7.6 billion to $18.6 billion at the downstream market.

A tangential factor affecting this litigation is the existence of a dispute between the State of Alaska and the Federal government regarding ownership of certain tracts. Thus, some of the tracts subject to the lease sale are owned solely by the State of Alaska, some are owned solely by the United States, and some are being jointly leased pending resolution by the Supreme Court of the ownership dispute. Only the Federally owned and disputed tracts are before this Court.

■ This Court notes that the standard of review is governed by the Administrative Procedure Act, 5 U.S.C. § 706.

## I. Federal Trust Responsibility

Plaintiffs allege that the Federal government has a trust responsibility to the Inupiats, that this trust responsibility requires the Federal government to protect the Inupiats' subsistence culture, that the trust responsibility must be held to exacting scrutiny, and that the Secretary has shirked his responsibility in the instant case. Defendants contend that either (1) no trust responsibility exists, or (2) any generalized trust responsibility that does exist has been fulfilled by the enactment of measures designed to mitigate the impact of the lease sale on the Inupiats.

■ A trust responsibility can only arise from a statute, treaty, or executive order. While treaties between Indian tribes and the Federal government have given rise to the notion of a generalized trust responsibility to Native Americans,[1] the underlying bases for the trust responsibility are the treaties themselves.[2] Defendants contend that no specific statute, treaty, or executive order creates a trust responsibility to the Inupiats, and that the Alaska Native Claims Settlement Act (ANCSA) 43 U.S.C. § 1601 et seq. precludes the existence of a generalized trust responsibility.[3]

■ Notwithstanding the ANSCA, a trust responsibility exists in the instant case. Every statute and treaty designed to protect animals or birds has a specific exemption for Native Alaskans who hunt the species for subsistence purposes.[4] These statutes have been construed as specifically imposing on the Federal government a

trust responsibility to protect the Alaskan Natives' rights of subsistence hunting.[5] This interpretation is consistent with the legislative history underlying the enactment of those statutes.[6]

■ The trust responsibility to the Alaskan Natives does not, however, transcend the statutes creating that responsibility. Rather, it serves three purposes, to wit: (1) it precludes the use of the environmental statutes to undermine the subsistence cultures,[7] (2) it requires the Secretary to be cognizant of the needs of the Inupiat culture, and (3) it demands of the Federal government (and thus the courts) rigorous application of the environmental statutes to protect the species necessary for the Inupiats' subsistence.[8] In the instant case, the environmental statutes are not being employed to the detriment of the Inupiats. Furthermore, the EIS alerted the Secretary to the impact of the lease sale and resulting activities on the Inupiat lifestyle. However, to the extent the Secretary has not complied with the Endangered Species Act, he has also shirked his trust responsibility to the Inupiats. Plaintiffs' ESA claims are discussed in Section III, infra.

## II. National Environmental Policy Act

Plaintiffs argue that the Secretary has failed to fulfill his obligations under the National Environmental Policy Act, 42 U.S.C. § 4321 et seq. (NEPA). They contend that the Environmental Impact Statement (EIS) prepared in conjunction with the lease sale proposal does not satisfy the requirements of § 102(2)(C) of NEPA. That section requires, in connection with any proposed major federal action "significantly affecting the quality of the human

---

1. See generally Chambers, Judicial Enforcement of the Federal Trust Responsibility to Indians, 27 Stanford L.Rev. 1213 (1975).

2. Id., at 1217–1223.

3. See also Cape Fox Corp. v. U. S., 456 F.Supp. 784, 799 (D.Alaska 1978).

4. See the Marine Mammal Protection Act, 16 U.S.C. § 1371(b); Endangered Species Act, 16 U.S.C. § 1539(e).

5. People of Togiak v. U. S., 470 F.Supp. 423, 428 (D.D.C.1979).

6. See Rosenblatt, Federal Trust Responsibility, 7 Bost.Col.Environ.Aff.L.Rev. 505, 530–543 (1979).

7. People of Togiak, supra.

8. See Rosenblatt, supra.

environment," a detailed statement discussing among other things "(i) the environmental impact of the proposed action, (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented, [and] (iii) alternatives to the proposed action."[9] Plaintiffs argue that the EIS prepared by DOI fails to consider certain impacts of the lease sale and fails to consider significant alternatives to the sale proposal.

NEPA's requirement of an adequate EIS is designed to insure that federal agencies consider the environmental consequences of proposed action at the time of decision-making. The EIS also serves to alert Congress and the public to those consequences.[10] Thus, the EIS must include a comprehensive discussion of all impacts of the proposal and of all reasonable alternatives to it. NEPA's requirements are essentially procedural.[11] They are designed to insure that decisions are fully informed and well considered.[12] The statute does not, however, mandate a particular result to the decision-making process. Although a decision must be made in light of all environmental consequences, NEPA does not require that an agency elevate environmental concerns over all others.[13] The statute does not preclude a decision that presents either the risk or certainty of serious environmental damage so long as the decision is not arbitrary and capricious.[14]

In a NEPA case, the court's function is limited.[15] "The only role for a court is to insure that the agency has considered the environmental consequences," of the action being considered.[16] If the EIS has alerted the decision maker to those consequences so that he has taken a "hard look" at them, it satisfies the requirements of NEPA.[17] Moreover, although NEPA requires that the EIS alert the decision maker to both the consequences of a proposal and alternatives to it, the agency's responsibility under NEPA is guided by a rule of reason.[18] The decision of how much detail to include is one for the agency itself. The discussion need not be exhaustive so long as it provides "information sufficient to permit a reasoned choice of alternatives so far as environmental aspects are concerned."[19] The Court's role is to determine whether the EIS provides the decision maker with sufficient detail to make that reasoned choice. Thus an oversight on a peripheral issue provides no basis for overturning an administrative decision properly made after an otherwise exhaustive proceeding.[20] Additionally, although NEPA obligates an agency to seek out the environmental consequences of a proposal and consider every significant aspect of its environmental impact,[21] interested parties cannot complain about the treatment given their particular concerns unless they have alerted the agency to their contentions, so long as the agency has given reasonable consideration to all

**9.** 42 U.S.C. § 4332(2)(C).

**10.** *See Kleppe v. Sierra Club*, 427 U.S. 390, 409, 96 S.Ct. 2718, 2729, 49 L.Ed.2d 576 (1976).

**11.** *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 558, 98 S.Ct. 1197, 1219, 55 L.Ed.2d 460 (1978).

**12.** *Id.*

**13.** *See Strycker's Bay Neighborhood Council v. Karlen,* —— U.S. ——, at ——, 100 S.Ct. 497, 62 L.Ed.2d 433 (1980).

**14.** *Id.*

**15.** *Vermont Yankee, supra,* 435 U.S. at 555, 98 S.Ct. at 1217.

**16.** *Strycker's Bay Neighborhood Council, supra,* —— U.S. at ——, 100 S.Ct. 497.

**17.** *Kleppe v. Sierra Club, supra,* 427 U.S. at 410 n. 21, 96 S.Ct. at 2730 n. 21; *NRDC v. Morton,* 148 U.S.App.D.C. 5, 16, 458 F.2d 827, 838 (D.C. Cir.1972).

**18.** *Alaska v. Andrus,* 188 U.S.App.D.C. 202, 216, 580 F.2d 465, 479 (D.C.Cir.1978).

**19.** *NRDC v. Morton, supra,* 148 U.S.App.D.C. at 14, 458 F.2d at 836.

**20.** *Vermont Yankee, supra,* 435 U.S. at 558, 98 S.Ct. at 1219.

**21.** *Id., Alaska v. Andrus, supra,* 188 U.S.App. D.C. at 210, 580 F.2d at 473.

significant impacts.[22] It is within this framework that the Court must analyze Plaintiffs' challenges to the EIS prepared in conjunction with the Beaufort Sea lease sale.

## A. Worst Case Analysis

It is undisputed that much is still unknown about the consequences of oil exploration and drilling in severe environments such as the Beaufort Sea. Little is known, for example, about the Bowhead whale and about the impact which exploration and drilling will have on the species.[23] NEPA requires that the "cost of uncertainty—i. e., the costs of proceeding without more and better information" be considered in the decision-making process.[24] Current Council on Environmental Quality Regulations require the inclusion in the EIS of a worst case analysis where there are gaps in relevant information or scientific uncertainty.[25] No worst case analysis was required in the instant case, however, since the draft EIS was prepared before the effective date of those regulations.[26] Nevertheless, the Department of the Interior chose to include a worst case analysis as a means of alerting the decision maker to the "cost of uncertainty."

Plaintiffs challenge the adequacy of the worst case analysis included in the Beaufort Sea lease sale EIS. They argue that having chosen to include a worst case analysis, the Agency was obligated to prepare an accurate one so as not to mislead the decision maker. Plaintiffs argue that the worst case analysis contained in the EIS is seriously flawed and misled the decision maker in two ways. They contend that it ignores many areas of uncertainty while grossly underestimating the worst possible impacts in areas of uncertainty that it does address.

Plaintiffs argue that the worst case analysis is misleading because it discusses only potential impacts on the Bowhead and Gray whales while uncertainty also exists concerning the project's possible impact on a number of other species inhabiting the area. This argument is unpersuasive. In the absence of a regulation requiring a more complete worst case analysis, it was reasonable for the Department to limit its formal worst case analysis to the endangered species that are threatened by the lease sale activities. Other sections of the EIS deal with the project's potential impact on birds, fish and polar bears and alert the reader to gaps in information concerning those species. Those sections also discuss known probable impacts and describe the general nature of impacts that can be expected in areas of uncertainty. The agency's decision to include a qualitative discussion of potential effects where uncertainty precludes quantitative prediction was reasonable. The presentation was sufficient to alert the decision maker to the cost of uncertainty. No more was required in the instant case.[27]

Plaintiffs argue additionally that the worst case analysis is misleading because it grossly underestimates the danger presented to the endangered species of whales by possible oil spills. They contend, for example, that both the likelihood of spills and their possible severity are greater than set forth in the analysis. The Court must weigh the reasonableness of the worst case analysis in light of its purpose of alerting the decision maker to the risks presented by proceeding despite gaps in information. Viewed from that perspective, Plaintiffs' additional challenges to the worst case analysis in the instant case must fail.

---

**22.** *Vermont Yankee, supra*, 435 U.S. at 553, 98 S.Ct. at 1218.

**23.** EIS, pp. 232–33.

**24.** *Alaska v. Andrus, supra*, 188 U.S.App.D.C. at 210, 580 F.2d at 473.

**25.** 40 C.F.R. § 1502.22.

**26.** *Id.*, § 1506.12.

**27.** While the worst case analysis is inadequate under CEQ regulations because it only considered effects on endangered species, those regulations do not apply to this case. When those regulations are applicable, however, the worst case analysis must alert the decision maker to the costs of uncertainty beyond endangered species.

The premise underlying the worst case analysis is that there is considerable uncertainty about the whales, about drilling in the Beaufort Sea environment and about the impact of drilling on the whales. The analysis is an assessment of possible worst case impacts based on certain assumptions about the gaps in available information. The analysis utilizes estimates made elsewhere in the EIS which the Department admits are of limited predictive value. Estimates of the likelihood of a major spill, for example, are based in part on drilling experiences in the Gulf of Mexico. Plaintiffs argue that use of this data makes the analysis misleading because of the obvious differences in conditions between the Gulf and the Beaufort Sea. The EIS, however, although utilizing the Gulf data, acknowledges that the two environments are radically different and that risks are much greater in the instant case. Plaintiffs also challenge certain assumptions relied on in the worst case analysis. The EIS itself, however, acknowledges the speculative nature of the task involved in preparing the worst case analysis. It specifically states that the analysis is premised on subjective judgments and assumptions about the areas of uncertainty whose statistical validity is at best questionable.[28] Given this, the analysis cannot be found misleading.

In essence, Plaintiffs' argument is that the worst case estimate contained in the EIS is not really the worst possible case. It is, however, a reasonable estimation of the most severe consequences that can be expected based upon certain assumptions. It was not unreasonable for the agency to rely on those assumptions. The worst case analysis contained in the EIS was a reasonable means of alerting the decision maker to the dangers presented by proceeding in the face of uncertainty.

B. *Cumulative Impact*

■ In addition to the Beaufort Sea lease sale, other significant federal and state energy development projects are in progress and planned for the North Slope region. Drilling in Prudhoe Bay, the Alaska Natural Gas Pipeline and the Trans-Alaska pipeline are illustrative. These developments taken as a whole can be expected to have significant cumulative effects on the environment of the North Slope far in excess of the impact that would be generated by any one project standing alone. Other independent projects need not always be considered in the preparation of an EIS for a particular proposal. If, however, there are several projects that will have cumulative effects upon a region so that the environmental consequences of a particular project cannot be considered in isolation, the decision maker must be alerted to those cumulative impacts.[29] In the instant case, consideration of cumulative impacts is essential if the decision maker is to be alerted to realistic possible consequences of the proposal before him. The discussion of cumulative impacts need not be overly detailed; like other aspects of the EIS, it is governed by the rule of reason. The discussion must, however, "furnish . . . such information as appears to be reasonably necessary under the circumstances for evaluation of the project."[30] The cumulative effects of other projects that can be expected to have similar impacts must be acknowledged. "[A]n agency may not . . . treating a project as an isolated 'single-shot' venture in the face of persuasive evidence that it is but one of several substantially similar operations, each of which will have the same polluting effect in the same area. To ignore the prospective cumulative harm under such circumstances could be to risk ecological disaster."[31]

■ Plaintiffs argue correctly that the Beaufort Sea EIS fails to alert the decision maker to all possible environmental consequences of the proposal before him because it does not adequately consider cumulative

28. EIS p. 237.

29. *Kleppe v. Sierra Club, supra,* 427 U.S. at 409–10, 96 S.Ct. at 2729–30.

30. *NRDC v. Callaway,* 524 F.2d 79, 88 (2nd Cir. 1975).

31. *Id.*

impacts of the proposal and other energy projects on the North Slope. Although, as Defendants note, the discussion of cumulative impacts is governed by the rule of reason, the EIS does not provide information that is "reasonably necessary under the circumstances for evaluation of the project." The EIS ignores many cumulative impacts and gives only cursory treatment to others that it does address.

Although the EIS acknowledges the existence of potential cumulative impacts on some species,[32] cumulative effects on other species, such as polar bears and caribou are not addressed.[33] In addition, where cumulative effects are discussed, the treatment often fails to provide the decision maker with information that is necessary to an assessment of possible environmental consequences of the proposal. Defendants argue correctly that it is impossible to quantify all cumulative impacts because of the numerous uncertainties concerning this and other projects. Moreover, a qualitative discussion of cumulative impacts sufficient to alert the decision maker to the consequences of a proposal would itself be reasonable. In the instant case, however, the discussions of cumulative impacts do not even alert the decision maker to the qualitative nature of likely cumulative effects. The discussion of cumulative impacts on birds, for example, simply states that cumulative impacts will result.[34] An acknowledgement of the existence of cumulative impacts is not sufficient. The EIS must alert the decision maker to the nature of those cumulative effects for the discussion to have utility.

C. *Alternatives to the Proposal*

 NEPA requires that an EIS include consideration of alternatives to a proposed action.[35] The agency must go beyond simply enumerating alternatives and discuss their environmental consequences.[36] The discussion need not "include every alternative device and thought conceivable by the mind of man." [37] Rather, as in other areas, the consideration of alternatives required in an EIS is governed by the rule of reason. The agency itself determines what alternatives should be considered and how extensive its treatment of them should be. NEPA requires that the EIS include information sufficient to permit a reasoned choice of alternatives so far as environmental aspects are concerned. It is crucial, however, that the EIS provide the decision maker with enough information to make that reasoned choice. The discussion of alternatives has been characterized as "the linchpin of the entire impact statement." [38]

Plaintiffs argue that the Beaufort Sea EIS fails to adequately consider alternatives of three sorts:

(1) alternative energy sources;

(2) alternative mitigation measures;

(3) alternative management schemes for the Beaufort Sea area.

### (1) *alternative energy sources*

The EIS contains extensive discussion of alternative energy sources to the exploitation of the Beaufort Sea.[39] Plaintiffs argue that this treatment is inadequate because the EIS does not specifically consider alternative sources of oil and gas in nearby areas on the North Slope. This contention is, however, without merit. The EIS section discussing alternative energy sources deals with a range of other sources of energy as possible substitutes for oil and gas supplies

---

**32.** EIS, pp. 226 (birds), 230 (seals), 236 (whales).

**33.** *See Id.*, pp. 230–32.

**34.** *Id.*, p. 226.

**35.** 42 U.S.C. § 4332(2)(C)(iii).

**36.** *NRDC v. Callaway, supra,* 524 F.2d at 92, *NRDC v. Morton, supra,* 148 U.S.App.D.C. at 12, 485 F.2d at 834.

**37.** *Vermont Yankee Nuclear Power Corp., v. NRDC, supra,* 435 U.S. at 551, 98 S.Ct. at 1215.

**38.** *Alaska v. Andrus, supra,* 188 U.S.App.D.C. at 211, 580 F.2d at 474; *Monroe County Conservation Council, Inc. v. Volpe,* 472 F.2d 693, 697–98 (2nd Cir. 1972).

**39.** EIS pp. 366–86.

from the Beaufort Sea should the lease sale be withdrawn. Substitution of conventional oil and gas supplies elsewhere in the United States is considered. Plaintiffs' argument is essentially that the treatment is not specific enough. The method chosen by the agency for treating the issue was, however, a reasonable one. NEPA requires no more.

(2) *alternative mitigation measures*

 Plaintiffs argue that the EIS fails to adequately consider mitigation measures, specifically operating orders and lease stipulations, to be employed in conjunction with development of the Beaufort Sea. They contend that the EIS is flawed because it fails to discuss alternatives to those operating orders and mitigating measures and to discuss the comparative environmental consequences of those alternatives. Defendants note that the Secretary is conducting a separate environmental analysis of the proposed operating orders and contend that no environmental analysis or discussion of alternatives was therefore required in the EIS. They argue further that the discussion of lease stipulations contained in the EIS satisfied the requirements of NEPA.

In *Alaska v. Andrus*,[40] the Court of Appeals for this Circuit held that if adequate operating orders are a premise for the Secretary's decision to proceed with a lease sale, the issuance of those orders "must be conducted with full consideration of environmental consequences and alternatives."[41] The Plaintiffs do not deny the Secretary is undertaking that consideration. Rather, they challenge the method he has chosen. The decision to initiate a separate environmental analysis of the operating orders was, however, a reasonable one. The Beaufort Sea EIS sets forth the proposed orders and explains the process of comment and review that is being undertaken. In this manner, it gave the decision maker reasonable notice of the nature of the operating orders that will ultimately be enacted

and of their mitigatory aspects. This satisfies the requirements of NEPA.

 The lease stipulations are an additional important mechanism for minimizing the environmental impacts of oil exploration and drilling on the Beaufort Sea environment. As such, the rationale of *Alaska v. Andrus* requires that the EIS alert the decision maker to the probable effectiveness of each stipulation and to reasonable alternative stipulations. However, the EIS makes no attempt to do this. Instead, it merely sets forth the content of each stipulation and its general rationale.[42] Given the importance of the stipulations to the proposal, this treatment does not satisfy the requirements of NEPA. Important alternatives to the current stipulations are not addressed. For example, the EIS does not consider as an alternative the NMFS recommendation of extending the seasonable limitation on drilling beyond the current two year period. Without a consideration of alternative lease stipulations the EIS fails to satisfy the requirements of NEPA. It does not provide the decision maker with sufficient information to make a reasoned choice of alternatives regarding this aspect of the lease sale proposal.

(3) *alternative management schemes for the Beaufort Sea area*

 Finally, Plaintiffs contend that the discussion of alternatives must include management of the Beaufort Sea pursuant to other Federal statutory schemes, such as the Marine Sanctuary Act. It is admitted that the EIS does not contain such alternatives. On this issue, Plaintiffs must prevail. *Commonwealth of Mass. v. Andrus* is dispositive.[43]

III. *The Endangered Species Act*

 Plaintiffs assert that the Secretary of the Interior (Secretary) has violated Sections 7(a)(2), 7(b), and 7(d) of the Endan-

---

**40.** 188 U.S.App.D.C. 202, 580 F.2d 465 (D.C. Cir. 1978).

**41.** *Id.*, 188 U.S.App.D.C., at 216, 580 F.2d, at 479.

**42.** EIS, pp. 288–352.

**43.** 594 F.2d 872, 884–886 (1st Cir. 1979).

gered Species Act (ESA).[44] Section 7(a)(2) requires that the Secretary insure that all agency action is not likely to jeopardize the continued existence of an endangered species.[45] Section 7(b) requires that a biological opinion be issued by the agency with jurisdiction over the endangered species to ascertain whether the proposed action is likely to jeopardize the listed species.[46] Section 7(d) forbids the irreversible or irretrievable commitment of resources with respect to the agency action if the investment would foreclose reasonable and prudent alternative measures,[47] and the agency action might violate Section 7(a)(2).

A threshold issue to be determined by this Court is the scope of the "agency action" in the instant case. Defendants assert that agency action is defined by the Outer Continental Shelf Lands Act (OCSLA), 43 U.S.C. § 1331, et. seq., because the lease sale is being conducted pursuant to that statute. In the OCSLA, Congress provided an orderly mechanism governing the resource exploitation process. This mechanism divides that process into three segments, to wit: (1) the lease sale and pre-exploration activities,[48] (2) exploration activities,[49] and (3) production activities.[50] The Secretary is provided maximum flexibility by the OCSLA. Each step in the process is scrutinized by him, and Environmental Impact Statements (EIS) must be issued before performance of the first and third steps.[51] The Secretary has the power to promulgate regulations applicable to any OCSLA-related activities, even if those regulations were not in effect at the time of the sale.[52]

Because each step is scrutinized by the Secretary, who has the power to issue regulations that would protect any endangered species, Defendants contend that any analysis of the second and third steps of the OCSLA process would be speculative. They assert that it is only the first step in that process—the lease sale and pre-exploration activities—that constitutes agency action, and thus it is only this step that is presently subject to judicial scrutiny.

Defendants assertion must be rejected, however; it would lead to the inconsistent enforcement and possible emasculation of the Endangered Species Act. Under Defendant's analysis, courts would not define agency action by the statute containing those words. Rather, agency action would be ascertained by viewing the statute authorizing the expenditures subject to the ESA claim. Agency action as a *factual* concept—what the agency is doing in a particular case—may be derived by scrutinizing the statute authorizing the agency action. But agency action as a *legal* concept—what is acceptable agency action under the Endangered Species Act—can only be determined by scrutinizing that statute. Otherwise, any statute providing an agency with maximum flexibility and planning ability—as the OCSLA does—would also tacitly relieve that agency from much of the scrutiny required by the ESA. Had Congress desired this result, it would have so stated in either the ESA or the OCSLA. The ESA contains a few exceptions, none of which is applicable here,[53] and the OCSLA expressly provides that it is a non-exclusive statute.[54] It is clear that Congress intended the Endangered Species Act to apply to OCSLA lease sales. It is also evident that the parameters of agency action must be

---

**44.** This statute was amended on December 19, 1979. The amendments were intended to clarify the law, not alter it. See Pub.L. 96–159, and the House Committee Report, No. 697, 96th Cong., 1st Session (1979), U.S.Code Cong. & Admin.News, p. 4761.

**45.** 16 U.S.C. § 1536(a)(2).

**46.** Id., § 1536(b).

**47.** Id., § 1536(d).

**48.** 43 U.S.C. § 1337.

**49.** Id., § 1340.

**50.** Id., § 1351.

**51.** Id., § 1346.

**52.** Id., § 1334(a).

**53.** See 16 U.S.C. § 1539.

**54.** 43 U.S.C. § 1333(f).

ascertained by the statute containing those words—the ESA.

The Endangered Species Act defines agency action as "any action authorized, funded, or carried out by such agency."[55] The Supreme Court has given this definition a very broad scope. In *TVA v. Hill,*[56] Justice Powell argued in dissent that agency action meant *"prospective actions, i. e.,* actions with respect to which the agency has reasonable decision-making alternatives still available."[57] Chief Justice Burger, writing for the majority, indicated that not only prospective actions, but all actions contemplated by an agency are subject to ESA scrutiny.[58]

 The ESA, as amended,[59] affirms the Supreme Court's expansive concept of agency action. The statutory language cited in *TVA v. Hill* remains unchanged, and the legislative history reflects Congressional approval of the Supreme Court's approach in that case.[60] Moreover, the amendments requiring a biological opinion, precluding an irreversible and irretrievable commitment of resources, and providing for exceptions to the Act in unique circumstances reflect Congressional response to *TVA v. Hill.*[61] These amendments require a federal agency to exercise caution when its activities might jeopardize the existence of an endangered species. Caution can only be exercised if the agency takes a look at all the possible ramifications of the agency action. As Senator Culver stated,

> The earlier in the progress of a project a conflict [between a species and the project] is recognized, the easier it is to design an alternative consistent with the requirements of the act, or to abandon the proposed action.[62]

The parameters of agency action are best understood in light of this "proceed with caution" Congressional mandate. The ESA requires that agency action be defined broadly.

The Secretary clearly understood that an expansive vision of the lease sale was required by the ESA. He attempted to perform, and in some respects did perform, a comprehensive analysis of all the ramifications of the lease sale. Yet the Secretary now argues that it is only the lease sale, and not prospective decisions, that constitute agency action under the ESA. His allegation is inconsistent with his behavior prior to this suit, the Supreme Court's ruling in *TVA v. Hill, supra,* and subsequent legislation. It is clear that, in the instant case, agency action constitutes the lease sale and all resulting activities.

A. *The § 7(b) Claim.*

 Section 7(a) states that the agency with jurisdiction over an endangered species—in this case the National Marine Fisheries Service (NMFS)—must consult with the action agency to determine that there is little likelihood of jeopardizing the continued existence of the endangered species. Section 7(b) requires that "promptly after the conclusion of consultation," NMFS must provide the Secretary "a written statement of [its] opinion, and a summary of the information on which the opinion is based, detailing how the agency action affects the species . . . ." NMFS must "suggest those reasonable and prudent alternatives which [it] believes would not violate subsection (a)(2) and can be taken by the Federal agency or the permit or license applicant in implementing

---

55. 16 U.S.C. § 1536(a)(2).

56. 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978).

57. *Id.,* at 205, 98 S.Ct. at 2307.

58. *Id.,* at 173, 98 S.Ct. at 2291.

59. The ESA has been amended twice since *TVA v. Hill,* on November 10, 1978 (Pub.L. 95–632), and December 19, 1979. *See* Note 1, *supra.*

60. H.Rep. No. 697, 96th Cong. 1st, Session at 13 (1979).

61. *See* Cong. Rec., July 17, 1978, at S10893–S10897.

62. *Id.,* at S10896.

the agency action."[63] The sole issue under § 7(b) is whether the November 6, 1979, letter from Mr. Terry Leitzell of NMFS to Mr. Frank Gregg, Director of the Bureau of Land Management (BLM) constitutes a biological opinion.

The letter indicates that insufficient information exists to determine whether the lease sale and resulting activities violate § 7(a)(2). Plaintiffs argue that this proves that the letter is not a biological opinion, since such an opinion cannot be based on insufficient data. This contention is erroneous. As the House Committee Report clearly indicates, "If the biological opinion is rendered on the basis of inadequate information then the Federal agency has the continuing obligation to make a reasonable effort to develop that information. . . ."[64] Congress foresaw the possibility that inadequate information would exist at the initiation of agency action. Rather than preclude all agency activity because of this dearth of data, Congress permitted the consulting agency to issue an incomplete biological opinion. Should such an opinion be issued, the action agency must continue researching the effects of agency action on a species. Consultation must also be continued until a comprehensive biological opinion satisfying the mandate of § 7(b) is developed. The letter does not fail as a biological opinion merely because it is based on inadequate information.

It is evident, however, that the letter fails to satisfy both the statutory requirements and the legislative purposes of a biological opinion. The statute requires a summary of the relevant information, a detailed evaluation of the impact of the agency action on the species and proposed reasonable and prudent alternatives. Two legislative purposes underlie these requirements. First, the biological opinion, as the culmination of the consultation process, is designed to attenuate any conflicts between the agency action and the welfare of the endangered species. Reasonable and prudent alternatives must be proposed by the consulting agency so that the action agency can evaluate options that might reconcile any conflict. The biological opinion is a deliberative tool, provided by the consulting agency to the action agency, necessary to guarantee compliance with the ESA and mitigate deleterious impacts of agency activity.[65] Second, the biological opinion provides courts with substantial evidence of an agency's compliance with § 7(a)(2).[66] A comprehensive biological opinion covering all aspects of the agency action is essential if these legislative purposes are to be satisfied.

The instant case involves the legality of agency action taken pursuant to the OCSLA. As a factual matter, the agency action involves a series of steps towards a single result—exploitation of the Beaufort Sea resources. When the statute authorizing agency action requires that the agency take incremental steps, a biological opinion must scrutinize these steps for possible violations of § 7(a)(2). If the agency cannot insure that § 7(a)(2) will ultimately be complied with, the ESA does not require that Government to hold all activity in abeyance. As the House Committee Report notes, "If a Federal agency proceeds with the action in the face of inadequate knowledge or information, the agency does so with the risk that it has not satisfied the standard of § 7(a)(2) and that new information might reveal that the agency has not satisfied the standard of § 7(a)(2)."[67]

But inadequate information does not provide a foundation for reckless abandon. As was noted earlier, the duty to consult is not fulfilled until a biological opinion based on adequate information ex-

---

**63.** 16 U.S.C. § 1536(b), as amended by Pub.L. 96–159 (Dec. 19, 1979).

**64.** H.Com.Rep. No. 697, 96th Congress, 1st Sess., at 12 (1979), U.S.Code Cong. & Admin. News, p. 4780.

**65.** *See* Cong.Rec., July 17, 1978, at S10893–10895.

**66.** H.Com.Rep., *supra*, at 12.

**67.** *Id.*

ists.[68] Moreover, § 7(a)(2) and § 7(d) limit the intermediate steps an action agency may take when adequate knowledge is unavailable. The ESA requires that the consulting agency scrutinize the total scope of agency action, pursuant to § 7(b). If inadequate information exists for a comprehensive biological opinion, then the action agency must (1) continue research and consultation so that a comprehensive biological opinion may be issued, and (2) obtain § 7(b) biological opinions, based on adequate information for the intermediate activities as the activities become ripe for analysis. This "ripeness" must be determined by evaluating the factual context underlying the agency action. Thus, in the OCSLA context, the agency performs its activities in three discrete steps; the lease sale and pre-exploration activities, exploration activities, and production activities. Before any step is approved by the Secretary, he must scrutinize a § 7(b) opinion based on adequate information, in order to preclude violations of § 7(a)(2). This analysis is consistent with the OCSLA and the Secretary's "ongoing responsibility" under the Endangered Species Act.[69]

In the instant case, the November 6 letter is woefully inadequate as a biological opinion. There is no summary of relevant information. Rather, reference is made to a letter written on August 25, 1978, indicating that the August 25 letter shows why insufficient information exists at the present time. The November 6 letter does not state or address what effects any of the agency's intermediate activity would have on the endangered species. If the August 25 letter is an indication of NMFS views, then many intermediate steps might endanger the Bowhead. That letter states in pertinent part:

> The Bowhead whale, one of the most endangered species of great whales, is expected to be seriously impacted by any perturbation that increases stress on the population.

The Bowhead and Gray whales, because of severe environmental conditions to which these whales are subject, and the special adaptations that enable them to tolerate and exploit this environment, could be especially vulnerable to impacts of oil and gas development. One critical aspect of the ice-dominated environment that may magnify the impact of oil on marine mammals is the limited amount of open water that is present in or about the edge of pack ice. The small open areas are vital to these whales for movement, breathing, and feeding, and such areas may hold various fractions and concentrations of oil for long periods of time. Potential first-order effects of oil pollution on marine mammals could include: (1) ingestion of oil with unknown effect on whale physiology, (2) irritation of skin and eyes, (3) impairment of thermal regulation, (4) fouling of the feeding mechanism (i. e., baleen plates), and (5) contamination of calving areas. Human activities, including seismic surveys and ship traffic, may disturb these whales which utilize shallow waters for migrating, breeding, or feeding. The most critical second order impact would be the reduction of food supplies through contamination or alteration of their marine habitat. Bowhead whales are filter feeders whose baleen plates could become contaminated by oil, thereby perhaps interfering with feeding success. Other adverse effects, both direct and indirect, might be caused by developmental activities in the Beaufort Sea. Petroleum development accompanied by an increased risk of oil spill and disturbance caused by noise from increased air and sea traffic could have serious but presently unmeasurable effects on feeding, mating, and migration patterns and behavior of Bowhead whales and other cetaceans.

Ship traffic providing logistic support to the proposed lease area would use the same access route as the Bowhead and other whales. The resulting disturbance

---

**68.** *Id.*

**69.** *Conservation Law Foundation v. Andrus*, No. 79–1585, Slip Op. at 6 (1st Cir. Dec. 17, 1979).

might affect whales along their entire migration route, as well as on their summering grounds in the Beaufort Sea. This is a significantly greater intrusion in time and space than the activities in the proposed lease area itself.

The November 6 letter does not address the impact of gravel islands on the Bowhead. An earlier letter, dated August 10, stated, however,

No information is available regarding ice conditions and possible gravel islands influences. Polar pack ice conditions and leads influence migration of the Bowhead. What interference would gravel islands pose to Bowhead migration during bad ice years or polar ice drift? Leads between polar pack and shorefast ice increase and decrease in depending on weather conditions and reasons (Fig. 5.) Presence of artificial island could successfully prevent eastward migration of the Bowheads.

The November 6, 1979, letter does not adequately scrutinize the impact of the pre-exploration activities on the Bowhead. Nor does it suggest any reasonable and prudent alternatives to the agency action that might avoid threatening this species. The letter does not comply with § 7(b) of the ESA.

B. *The § 7(d) Claim.*

Section 7(d) states that

After initiation of consultation . . . the Federal agency and the permit or license applicant shall not make any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures which would not violate subsection (a)(2).

Only one court has addressed a § 7(d) claim;[70] because that court was analyzing § 7(d) in the context of a preliminary in-

junction, it did not address the issues presented here.[71]

Defendants assert that § 7(d) applies only during the consultation period because the purpose of § 7(d) is to prevent foreclosing reasonable and prudent alternatives while the consultation process is ongoing. Thus, they contend that (1) consultation has ended, and (2) § 7(d) is therefore inapplicable. This contention flies in the face of the facts in the instant case, and distorts the mechanism underlying the ESA.

■ First, as was pointed out in Section III(A) of this Opinion, the duty to consult does not end until a biological opinion, based 'upon adequate information, is written.[72] While a biological opinion can be based on inadequate information, in such cases the obligation to consult continues. Since there is no biological opinion in the instant case, much less an opinion based on adequate data, the consultation process has not ended. Thus, even if Defendants have correctly assessed the application of § 7(d), their conclusion is erroneous.

■ Second, Congress clearly envisioned that § 7(d) would remain viable until either the completion of the project or the granting of an exemption under § 7(h). This is clear from both the legislative history and the mechanism of the Act. Section 7(d) is tied to section 7(a)(2). If the Secretary is unable to comply with § 7(a)(2), 7(d) is in effect, and resources may not be committed in violation of this section.

The ESA requires a biological assessment to facilitate compliance with 7(a)(2). This assessment is conducted to identify any endangered species that may be affected by agency action.[73] If no species might be affected, agency action would not violate § 7(a)(2), and thus the commitment of resources would not violate § 7(d). If a species might be affected, consultation is re-

---

**70.** *Id.*

**71.** In that case, Plaintiff claimed that the resource lost was the Secretary's ability to prevent ESA violations. The Court correctly held, however, that the ESA applied to every stage

of OCSLA development: Thus, this "resource" was never lost.

**72.** *See* pages 351–353, *supra.*

**73.** 16 U.S.C. § 1536(c).

quired to determine what, if any, impact the agency action will have on the species.[74] Consultation ends when a biological opinion, based upon adequate information, is written.[75] If that opinion indicates that the agency action will not threaten an endangered species, no commitment of resources would violate § 7(d).

▮ The possibility exists, however, that subsequent to the commencement of agency action, additional information will indicate that an endangered species might be threatened within the meaning of § 7(a)(2).[76] Should this occur, resources may not be committed in violation of § 7(d). Rather, the agency or permit or license applicant must try to implement mitigating measures to save the endangered species. Consultation between the action agency and the agency with jurisdiction over the species must begin anew. As Senator Culver stated,

> A reasonable and responsible effort must be made to resolve the conflict *once it is known to exist*, and subsequent to the initiation of consultation, the construction agency [may make] no irreversible or irretrievable commitment of resources which forecloses the consideration of those modifications or alternatives to such action which are consistent with preserving the species or its critical habitat. [Emphasis added.][77]

Should no viable mitigation measures be available, the agency or permit or license applicant must apply for an exemption under § 7(h). As Senator Culver emphasized,

The Endangered Species Committee must address the benefits of all alternatives which might be available in lieu of the proposed action. This criterion makes it clear that the Endangered Species Committee must consider all options which might eliminate harm to the species, independent of the stage of project completion. As a project approaches completion certain alternatives to the proposed action may not be reasonably or prudently available as options. It is also clear that the earlier in the progress of a project a conflict is recognized, the easier it is to design an alternative consistent with the requirements of the act, or to abandon the proposed action. It may be feasible to utilize resources already expended or lands acquired for a proposed action to carry out alternatives, such as the development of parks or wildlife refuges, which are unrelated to the initial project. The Endangered Species Committee should apply this standard of reasonableness in assessing the availability of alternatives to any action before them for review.[78]

Thus, once a § 7(a)(2) issue arises, the consultation process is activated, § 7(d) is effective, and resources may not be committed in violation of this section.[79] Any other interpretation would defeat the legislative purposes underlying the amendments to the Endangered Species Act,[80] and undermine the effectiveness of the Endangered Species Committee. Clearly, § 7(d) is applicable in the instant case.

74. *Id.*, 1536(b).

75. *See* note 66, *supra.*

76. This is precisely what happened in *TVA v. Hill, supra.*

77. *See,* Cong.Rec., July 17, 1978, at S10896.

78. *Id.*

79. This conclusion is further supported by Congress' response to *TVA v. Hill, supra.* In that case, completion of the Tellico Dam would not have violated the ESA; rather, the Act would have been violated by the closing of the Dam. The Court enjoined the completion, as well as the closing of the Dam, however. Congress

found this result to be consistent with the ESA, and did not amend the Act to preclude future rulings of this kind. Rather, Congress made the Act more "flexible" by adding § 7(h), and attempted to preclude the need for balancing a completed (or near complete) project against the welfare of the species by adding § 7(d). *See* Cong.Rec., *supra,* at S10893–S10895.

80. As the House Report notes, "The conferees do not believe that any Federal agency or permittee should make any irreversible or irretrievable commitment of resources for the purpose or with the intent of foreclosing otherwise reasonable alternatives or in order to secure an exemption pursuant to § 7(h)."

It remains to be seen, however, what constitutes an "irreversible or irretrievable commitment of resources" that would have "the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures." As was noted earlier, this section was drafted in response to the Court's ruling in *TVA v. Hill.* In that case, the District Court had found that "there [were] no alternatives to impoundment of the reservoir, short of scrapping the entire project," and that "some $53 million would be lost in nonre-coverable obligations." [81] The District Court concluded that "at some point in time a federal project becomes so near comple-tion [as to be] incapable of modification . . . . Where there has been an irrever-sible and irretrievable commitment of re-sources by Congress to a project over a span of almost a decade, the Court should pro-ceed with a great deal of circumspection." [82] The District Court refused to enjoin the completion of the Dam, even though the ESA would be violated without that injunc-tion.

It is against this background that § 7(d) must be scrutinized. Congress enacted § 7(d) to prevent Federal agencies from "steamrolling" activity in order to se-cure completion of the projects regardless

of their impact on endangered species. [83] As the Supreme Court noted, the District Court was concerned in *TVA v. Hill* because "a large portion of the $78 million already expended would be wasted." [84] In response, Congress enacted § 7(d) to preclude the investments of large sums of money in any endeavor if (1) at the time of the invest-ment [85] there was a reasonable likelihood that the project, at any stage of develop-ment, would violate § 7(a)(2), [86] and (2) that investment was not salvageable (i. e. it could not be applied to either an alternative approach to the original endeavor or to another project). [87]

While it is clear that the government cannot now insure ultimate compliance with § 7(a)(2), [88] it does not follow that there is a reasonable likelihood of non-compliance. A reasonable likelihood can ordinarily be as-certained from a negative biological opin-ion, as happened in *TVA v. Hill,* [89] but no such opinion exists in the instant case. Rather there is no biological opinion at all, and adequate information for a definitive biological opinion does not exist. Since a biological opinion based on inadequate in-formation is envisioned by the ESA, [90] this Court must ascertain the parameters of § 7(d) assuming the existence of such a document. [91]

---

81. *TVA v. Hill, supra,* 437 U.S. at 166, 98 S.Ct. at 2288.

82. *Id.*

83. *See* note 80, *supra.*

84. *TVA v. Hill, supra,* at 166, 98 S.Ct. at 2288.

85. This analysis must be made at the time of the investment. As was noted earlier, upon receipt of a favorable biological assessment or favorable comprehensive biological opinion, an agency may assume that there is little likeli-hood of a subsequent violation of § 7(a)(2). No commitment of resources would violate § 7(d) unless additional information altered this as-sumption. Section 7(h) was enacted to deal with the latter occurrence, should it arise.

86. It is clear that if a biological opinion indi-cated that the project could not be completed without violating § 7(a)(2), a Court must enjoin further agency action. *See TVA v. Hill, supra.* It is equally clear that inadequate information cannot provide the basis for a halt to all agency

action. See Section III(A), *supra.* Thus, the likelihood of a § 7(a)(2) violation must be scru-tinized in the context of § 7(d).

87. If the resources are salvageable, the re-sources would not be wasted, and thus not irretrievably committed within the meaning of § 7(d).

88. *See* discussion of § 7(a)(2), *infra.*

89. *TVA v. Hill, supra,* at 166, 172, 98 S.Ct. at 2287, 2290.

90. *See* page 352, *supra,* and note 64.

91. It is clear that there has been a significant amount of consultation, in conformity with § 7(a)(2). The result of this consultation is that there is no adequate information upon which to determine the impact of the completed agency action on the endangered species. This aspect of the § 7(b) defect—the lack of a biological opinion indicating this conclusion and the rea-

When no definitive biological opinion can be issued because of inadequate information, the ESA does not require that the government halt all activities, unless the intermediate activities violate § 7(a)(2). Rather, the ESA permits non-jeopardizing activities, so long as the § 7(d) mandate is not violated. In the instant case, it is clear that the lease sale and pre-exploration activities do not violate § 7(d). Money invested in research of any kind cannot be considered wasteful—it provides the basis for informed decision-making, and is in all likelihood valuable in its own right. As the government correctly points out, the development of information (the crux of initial post-lease sale activities) should help avoid conflicts rather than create them. Furthermore, any information gathered in the Beaufort Sea would be useful for other arctic OCSLA activities, even if a subsequent § 7(a)(2) violation precluded production in this case. Finally, while the pre-exploration activities are expensive (the estimate before the Court puts the cost at roughly $157 million) this investment must be scrutinized in light of the specific activity. As the Government indicates, the oil and gas industry is a high risk business, and the industry accepts that some of its investments will not return producible oil or gas. The government has accepted some of these risks with the enactment of the Outer Continental Shelf Lands Act. This Court cannot undermine Congressional willingness to accept some of the risks of oil and gas production, merely because the subsequent production might violate § 7(a)(2).

### C. *The § 7(a)(2) Claim.*

Section 7(a)(2) contains both procedural and substantive requirements. It is clear from the foregoing analysis that, with the exception of the § 7(b) violation, the government has fulfilled the procedural requirements of § 7(a)(2). The substantive requirements of § 7(a)(2) state, in pertinent part:

Each Federal agency shall, in consultation with and with the assistance of the Secretary insure that any action authorized, funded, or carried out by such agency (hereinafter in this section referred to as an "agency action") is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary, after consultation as appropriate with affected States, to be critical, unless such agency has been granted an exemption for such action by the Committee pursuant to subsection (h) of this section. In fulfilling the requirements of this paragraph each agency shall use the best scientific and commercial data available.

It is clear that the Secretary is not presently in compliance with § 7(a)(2). Defendants claim that they have complied with § 7(a)(2) because the Secretary can protect the Bowhead by using powers delegated to him under the OCSLA. The insurance required by § 7(a)(2) must be derived from the consultation process as envisioned by the ESA, not from the possible use of amorphic powers delegated to a Federal agency under some other statute. Otherwise, statutes unrelated to the ESA could be used to achieve results inharmonious with that Act.[92]

It is equally clear that there have been no mitigating measures implemented that would ensure that the production of oil in the Beaufort Sea was not likely to jeopardize the Bowhead whale. It is uncontested that, at the present time, adequate information necessary for meaningful insurance does not exist. Contrary to Plaintiffs' assertions, however, this lack of compliance does not require the Court to enjoin the lease sale. Rather, as Sections III(A) and III(B) of this Opinion indicate, the govern-

---

sons underlying it—can probably be cured by the government fairly easily. Should this Court decide the case upon this issue alone, the parties would relitigate these issues as soon as the government cured the § 7(b) defect.

92. *See* pages 349–351, *supra.*

ment may pursue activities, even in the face of inadequate information, if (1) there is a reasonable likelihood of ultimate compliance, (2) there is no § 7(d) violation, and (3) the intermediate steps taken pursuant to the agency action comply with § 7(a)(2).

 Under the first step in this analysis, this Court finds that a reasonable likelihood of compliance exists at the present time.[93] First, there is no evidence of ultimate non-compliance. A negative biological opinion, regardless of the stage of development, would constitute substantial evidence of such non-compliance.[94] No such negative biological opinion exists, however. Second, the Secretary's actions do not reflect a desire to "steamroll" this project, regardless of the effects on the Bowhead. There is no evidence of bad faith; rather, both the Secretary and the State of Alaska seem desirous of both saving the whale and drilling for oil and gas. Finally, the Secretary retains broad powers under the OCSLA to insure that all Federal laws are complied with. This Court presumes that the Secretary will fulfill his legal obligation.[95]

As has been shown in Section III(B), the lease sale and pre-exploration activities do not violate § 7(d) of the Act.

 It is the third step of the analysis that Defendants cannot surmount. Because there is no § 7(b) biological opinion, the Secretary cannot properly assess the intermediate and ultimate effects of the agency action on the Bowhead. While adequate knowledge of the ultimate effects of the agency action is not essential at the present time (the Court notes that the requisite data is unavailable) § 7(a)(2) requires the Secretary to insure that intermediate agency action is not likely to jeopardize the continued existence of the Bowhead before such action is approved. Pursuing the pre-

exploration activities, without a comprehensive biological opinion scrutinizing those activities as required by § 7(b), would constitute a flagrant violation of § 7(a)(2), because the Secretary would have no grounds for insuring the safety of the Bowhead. Such an action by the Secretary would be arbitrary and capricious, and cannot be sanctioned by this Court.

## IV. The Outer Continental Shelf Lands Act

The OCSLA was enacted to encourage the "expeditious and orderly development [of mineral resources] subject to environmental safeguards."[96] The Court has noted how the OCSLA process provides an orderly mechanism for resource exploration and development.[97] Plaintiffs contend that the environmental safeguards contained in the OCSLA have been violated by the Beaufort Sea lease sale.

### A. Section 20(a)

Section 20(a) of the OCSLA states, in pertinent part:

(1) The Secretary shall conduct a study of any area . . . in order to establish information needed for assessment and management of environmental impacts on the human, marine, and coastal environments of the outer Continental Shelf . . .

(2) Each study . . . shall be commenced . . . not later than six months prior to the holding of a lease sale.

(3) In addition to developing environmental information, any study . . . to the extent practicable, shall be designed to predict impacts on marine biota which may result . . . from . . . development offshore on the affected and coastal areas.[98]

---

**93.** More information, or bad faith by the Secretary, might indicate that ultimate compliance is unlikely. This would be grounds for an injunction against further activity. As the Court noted earlier, the ESA applies to all steps in the OCSLA process. *See* note 69, *supra.*

**94.** *See* pages 354–357, *supra.*

**95.** *See Commonwealth of Massachusetts v. Andrus,* 594 F.2d 872, 888 (1st Cir. 1979).

**96.** 43 U.S.C. § 1332(3).

**97.** *See* pages 349–350, *supra.*

**98.** 43 U.S.C. § 1346(a).

Plaintiffs claim that Section 20(a) has been violated because (1) the studies commenced six months before the lease sale were inadequate as a matter of law, (2) the studies did not attempt to predict the impact of development on all marine biota, and (3) Defendants failed to commence a clean-up study. As support for the first proposition, Plaintiffs state that the NMFS objected to the studies being conducted by Defendants, and, in response to the objection, BLM drastically altered the course of research. Plaintiffs contend that the research was so substantially modified that the initial date of commencement was June 26, 1979, the date of the NMFS/BLM agreement.

It is evident from the record that 65 studies were initiated by Defendants pursuant to Section 20. The usefulness of some of these studies is questionable (it appears that some of the BLM's studies were duplicative of research being conducted by NMFS, and other studies did not sufficiently address the serious environmental problems posed by this lease sale), and drastic research modification occurred. Contrary to Plaintiffs' assertion, it is not the scope of modification that renders the initial research useless. Rather, that research must be purposeless on its face, regardless of subsequent modification. Plaintiffs' contention is incongruous with the OCSLA. That Act envisions continued evaluation;[99] all useful research undergoes modification as new information is developed. Ruling in Plaintiffs favor on this issue would act as a disincentive for future research modification, and undermine Congressional intent.[100]

Plaintiffs also allege that the research is inadequate because it does not predict the impact of development on all marine biota. This contention is without merit. Defendants have attempted to make such a prediction. That they have failed to do so with any degree of certainty does not mean that an effort has not been made. Rather, the effort has been made. As Defendants admit, more research is necessary to make a reasonable prediction. This research is presently being conducted. That is all the OCSLA requires.

Finally, Plaintiffs assert that Defendants' failure to conduct a cleanup study violates Section 20(a). This allegation is also erroneous. The OCSLA does not require that this study be conducted prior to the lease sale. Rather, it is part of the continuous process of additional studies authorized by Section 20(b).[101]

B. *Section 7*

Plaintiffs argue that Section 7,[102] which provides for interim agreements between the States and the United States, does not authorize the Secretary to confer management responsibility to the States. They assert that the granting of management responsibility over the disputed tracts will amount to a jurisdictional giveaway at a time when the environmental provisions of the OCSLA are necessary in order to ensure the orderly development of the Beaufort Sea. No jurisdictional giveaway exists in the instant case, however. First, the United States and the State of Alaska have presented the jurisdictional dispute to the United States Supreme Court for resolution. Thus, it is clear the Federal government is not attempting to abrogate its responsibility by giving the State of Alaska management responsibility. This Court declines Plaintiffs' invitation to rule on the land claim issue—a subject it lacks jurisdiction to entertain.

Second, Plaintiffs' fears are ill conceived. Unless the Supreme Court ascertains that Alaska is the rightful owner of the disputed tracts, Federal law will apply to the disputed areas. NEPA and the ESA impose obligations on the decision maker regardless of the context of his decision. The Secretary's decision—either to coordinate and approve

---

99. 43 U.S.C. § 1346(b).

100. *Id.*

101. *Id.*

102. 43 U.S.C. § 1337.

operations or to absolve himself of responsibility—is subject to review. Given the Federal assertion of ownership, any decision to shirk responsibility mandated by any Federal statute would be arbitrary and capricious. This Court need not exceed its jurisdiction to ensure that Federal responsibilities are carried out.

## C. Section 21

Section 21 states in pertinent part:

The Secretary . . . shall require, on all new drilling and production operations . . . the use of the best available and safest technologies which the Secretary determines to be economically feasible, whenever failure of equipment would have a significant effect on safety, health, or the environment, except where the Secretary determines that the incremental benefits are clearly insufficient to justify the incremental costs of utilizing such technologies.[103]

Plaintiffs allege that the BAST [104] requirements have not been met in the instant case because (1) there is no BAST provision in the Notice of Sale, and (2) the severe environmental conditions in the Beaufort Sea require the promulgation and implementation of standards well in advance of scheduled drilling, so that BAST can be developed. These contentions are erroneous.

■■ First, the Secretary is not required to reprint the OCSLA in the Notice of Sale. The potential lessees are cognizant of that Act's requirements, and are bound by law, even if they are not bound by contract.[105] Second, prior enactment of specific BAST standards would serve to undermine the flexibility inherent in the OCSLA. BAST standards are by nature evolutionary. As the First Circuit noted in *Conservation Law Foundation v. Andrus*

The definition of what constitutes best available technology is itself an ongoing process, tailored to adjust to changing technology. Appellants' position ignores this fact and, if adopted, would eliminate the flexibility in developing BAST regulations which the OCSLA envisions.[106]

Plaintiffs are concerned that, if standards are not established prior to exploratory drilling, the best available technologies will not be the best possible technologies. This fear is unfounded. Unless Defendants develop technology sufficient to protect the Beaufort Sea environment, authorization of any drilling would in all likelihood violate the Endangered Species Act,[107] the Marine Mammal Protection Act,[108] and other environmental statutes and treaties.[109] Plaintiffs' OCSLA allegations must be rejected.

## V. Remaining Statutory Claims

■■ The ESA and other laws and treaties require federal agencies to protect wildlife by protecting their habitat and preventing their taking, harassment or harm.

First, Section 9(a)(1) of the Endangered Species Act,[110] makes it:

unlawful for any person . . . to

. . .

(B) take any [endangered] species within the United States or the territorial sea of the United States; [or]

(C) take any such species upon the high seas . . . ..

Section 3(13) of the Act defines person to include "any officer, employee, agent, department, or instrumentality of the Federal Government, [or] of any State or political subdivision thereof." [111] Section 3(19) defines the term "take" to mean "harass" or "harm." [112]

---

**103.** 43 U.S.C. § 1347(b).

**104.** Best Available and Safest Technologies.

**105.** *See Conservation Law Foundation v. Andrus, supra,* at 5–6.

**106.** *Id.,* at 15.

**107.** *See* Section III, *supra.*

**108.** *See* Section V, *infra.*

**109.** *Id.*

**110.** 16 U.S.C. § 1538.

**111.** *Id.,* § 1532(13).

**112.** *Id.,* § 1532(19).

The regulations of the National Marine Fisheries Service, which enforces the application of the Act to whales, provide that no person shall take any endangered species without a permit [113] and define "take" and "person" in the same terms as the Act.[114] While NMFS has not defined "harass" in a regulation, it has issued a "Notice of Interpretation" applying the term to the Humpback whale in the Hawaiian Islands which includes, *inter alia*, flying less than 1000 feet over a whale, bringing a vessel within 300 yards of the whale, or committing "any other act or omission that substantially disrupts the normal behavioral pattern of the whale." [115]

The Fish and Wildlife Service, which also has enforcement responsibilities under the Act, has defined "harass" to mean:

an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to breeding, feeding or sheltering.[116]

Finally, the FWS has defined "harm" to mean:

an act or omission which actually injures or kills wildlife, including acts which annoy it to such an extent as to significantly disrupt essential behavioral patterns, which include but are not limited to, breeding, feeding or sheltering; significant environmental modification or degradation which has such effect is included within the meaning of harm.[117]

Second, the Marine Mammal Protection Act provides that efforts shall be made to "protect the rookeries, mating grounds and areas of similar significance for each species of marine mammal from the adverse effects of man's actions" and that "the primary objective of their management should be to maintain the health and stability of the marine ecosystem." [118] The Act further provides that it is generally unlawful:

for any person or vessel or other conveyance to take any marine mammal in waters or on lands under the jurisdiction of the United States . . . .[119]

The Fish and Wildlife Service enforces the Marine Mammal Protection Act to protect polar bears. Its regulations provide that it is unlawful for any "person" to "take" any marine mammal on the high seas or on lands under the jurisdiction of the United States. They similarly define "take" as "to harass, hunt, capture, collect, or kill, or attempt to harass, hunt, capture, collect, or kill any marine mammal . . . ." [120] The National Marine Fisheries Service implements the Marine Mammal Protection Act for whales, porpoises, seals, and seal lions. Its regulations also prohibit the taking of any marine mammal on the high seas or on lands under the jurisdiction of the United States. They define "take" in the same manner as the Fish and Wildlife Service regulations.[121]

Third, the United States has entered into a multilateral "Agreement on the Conservation of Polar Bears" which generally prohibits the hunting, killing and capturing of polar bears and which requires the United States to "take appropriate action to protect the ecosystems of which polar bears are a part, with special attention to habitat components such as denning and feeding sites . . . ."

Fourth, Section 2 of the Migratory Bird Treaty Act prohibits the taking of migratory birds except under conditions established in regulations of the Fish and Wildlife Service. The provisions of this Act apply to the killing of birds "by any means or in any

---

113. 50 C.F.R. § 222.21.

114. 50 C.F.R. § 217.10.

115. 55 Fed.Reg. 1113–1114.

116. 50 C.F.R. § 17.3.

117. *Id.*

118. 16 U.S.C. § 1361.

119. *Id.*, § 1372(a)(2)(A).

120. 50 C.F.R. § 18.11.

121. 50 C.F.R. § 216.11.

manner" even if the killing was not intentional.[122]

The Migratory Bird Treaty Act implements treaties between the United States and Great Britain, Mexico and Japan. In addition, the Convention between the United States and the U.S.S.R. Concerning the Conservation of Migratory Birds and Their Environment requires the United States to "undertake measures necessary to protect and enhance the environment of migratory birds and to prevent and abate the pollution or detrimental alteration of that environment."

The application of these statutes and treaties to the instant case to some extent parallels the mandates of the Endangered Species Act (see Section III). The statutes and treaties do not require the government to halt all activity merely because there is a possibility that agency action will result in a "taking" at some future time. Rather, the government must proceed with caution to ensure that agency action does not eventually violate the aforesaid laws.

While the EIS indicates that the government might well encounter serious difficulty in complying with the above mentioned statutes and treaties, injunctive relief should not herein issue unless danger to the protected species is sufficiently imminent or certain. Otherwise, government activity would be prematurely halted, and statutes authorizing specific activity—like the OCSLA—would be undermined. The lease sale itself threatens no species. The Secretary has both the power and the obligation to ensure that the applicable laws are enforced.[123] Until the species are so significantly threatened that continued activity by the Secretary would be arbitrary and capricious, this Court cannot, without further Congressional direction, enjoin the activity, pursuant to the aforementioned statutes and treaties.

## VI. *Relief*

Plaintiffs have prevailed on claims under NEPA and the ESA. Different relief is required for claims under the two statutes, in order to further the policies underlying their enactment. The relief afforded under NEPA must be shaped to preserve the decision-making process and prevent the Secretary from approving actions based on an inadequate EIS. The relief afforded under the ESA must be designed to preclude agency action if the Secretary could not insure the continued existence of the endangered species. This Court is cognizant, however, of the strong public policy underlying OCSLA lease sales, and must tailor relief consistent with its goals.

Defendants have posited two factors that should limit the scope of relief. First, they contend that the State of Alaska is an indispensable party that is not present before the Court, and assert that no relief should affect the disputed tracts. Second, they argue that all future relief must be afforded in the courts of appeals and that this Court should narrow its relief out of respect for the Congressional determination of jurisdiction. These issues must be addressed before the Court grants relief.

Defendants argue that the State of Alaska is an indispensable party, and should not be affected by any ruling of this Court. The Court notes that the State filed an *amicus* brief, presented oral argument, and has been afforded the opportunity to intervene. Alaska's failure to intervene cannot subvert this Court's ability to grant appropriate relief. Furthermore, relief has been tailored to maintain the *status quo* regarding the disputed tracts, pending resolution of the dispute by the Supreme Court. Since the integrity of the bidding process has been preserved, the State of Alaska will not be permanently affected by the adverse determination in the instant case.

Defendants' contention that all future relief must be afforded by the courts of appeals is without merit. Their argument may be summarized as follows: (1) the parameters of the agency action in the instant case are shaped by the OCSLA; (2)

---

**122.** 16 U.S.C. § 703.

**123.** *See Commonwealth of Mass. v. Andrus, supra,* at 888.

the OCSLA provides for review of the Secretary's approval, modification, or disapproval of exploration or production plans only in the courts of appeals; [124] (3) this Court, therefore, will lack jurisdiction to review production or exploration plans as they impact on the ESA; and (4) consequently, the Court should not "interfere" with the jurisdiction of the courts of appeals in granting relief. As was noted earlier, however, the legal parameters of a cause of action must be defined by the statute creating that cause of action.[125] Thus, Defendants' assertion is valid for all claims arising under the OCSLA. The jurisdictional basis for claims arising under other statutes, however, must be ascertained by scrutinizing those statutes. This assertion is supported by the OCSLA itself, which provides that "nothing in this section shall restrict any right which any person or any class of persons may have under any other Act or common law to seek appropriate relief." [126]

The Endangered Species Act provides for district court review of any claims arising under it. Thus, if any subsequent agency activity gives rise to a claim under the ESA, this Court would have jurisdiction to review that claim. Should the contention involve exploratory or production activities, this Court would not scrutinize the plan *qua* plan. Rather, it would only evaluate the plan to the extent such scrutiny provides this Court with a factual basis for the underlying agency action.[127] The scope of district court review would be determined by the Endangered Species Act's definition of agency action; and it is this action, not an exploration or production plan, that would be scrutinized by the Court.

■ In the instant case, NEPA requires that the pre-lease sale *status quo* be maintained, in order to preserve the decision-making process. The ESA does not preclude the lease sale itself, but prohibits all intermediate agency action until a § 7(b) biological opinion indicates that the contemplated action would not violate § 7(a)(2). Neither statute requires the invalidation of the agency action that has already taken place, since none of the agency action has altered the *status quo*. The Secretary is not enjoined from receiving the lessee's offers, and this aspect of the bidding process remains free from judicial intervention. NEPA requires, however, that this Court enjoin the Secretary from accepting any of the offers until the EIS is adequately supplemented.[128] Otherwise the Secretary's decision to consummate the lease sale would be based on a substantially flawed EIS, and thus arbitrary and capricious.[129]

The ESA requires this Court to enjoin the issuance of leases that permit any activities until the Secretary can insure that those activities will comply with § 7(a)(2). At a minimum, a § 7(b) biological opinion, based on adequate information, must guide the Secretary in making a § 7(a)(2) determination regarding the pre-exploratory activities. Exploration and production activities will be ripe for adjudication in this Court under the ESA at a later date.[130]

It is therefore by the Court this 22nd day of January, 1980,

ORDERED, that Plaintiffs' Motions for Summary Judgment, as they relate to claims under the Federal Trust Responsibility, Section 102(2)(C) of the National Environmental Policy Act, and Sections 7(a)(2) and 7(b) of the Endangered Species Act are GRANTED, and Defendants' Motions regarding those claims are DENIED; and it is

FURTHER ORDERED, that with respect to all other claims, Defendants' Motions for Summary Judgment are GRANTED, and Plaintiffs' Motions are DENIED; and it is

124. 43 U.S.C. § 1349(c)(2).

125. *See* pages 350–351, *supra.*

126. 43 U.S.C. § 1349(a)(6).

127. *See* pages 350–351, *supra.*

128. *See Commonwealth of Mass. v. Andrus, supra*, 594 F.2d at 874–80.

129. *See Alaska v. Andrus, supra.*

130. *See* pages 352–353, *supra.*

FURTHER ORDERED, that the Secretary is enjoined from leasing any tracts until the requirements of the Trust Responsibility, NEPA, and the ESA are fulfilled, in accordance with this Opinion.